**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:07cv1023** |
| | ) | |
| **JAPANESE RIFLE,** | ) | |
| **SERIAL NO. 1270821,** *et al.,* | ) | |
| **Defendants.** | ) | |
| _____ | ) | |
| | ) | |
| **TIMOTHY A. TAYLOR,** | ) | |
| **Claimant.** | ) | |

## <u>MEMORANDUM OPINION</u>

Claimant in this civil forfeiture matter contends he is the innocent owner of valuable firearms the government seized from his father and seeks to forfeit on the ground that his now-deceased father, a felon, impermissibly possessed these firearms, in violation of 18 U.S.C. § 922(g). At issue on cross-motions for summary judgment are the following questions:

1. Is the forfeiture of firearms based on a violation of 18 U.S.C. § 922(g) permissible pursuant to 18 U.S.C. § 924(d)(1) where, as here, the putative possessor of the firearms was never convicted of a § 922(g) violation?

2. Given the absence of a § 922(g) conviction, do the undisputed record facts nonetheless establish each of the elements of a § 922(g) violation?

3. If the firearms are subject to forfeiture, has the Claimant nonetheless established by a preponderance of the evidence that he was unaware of the illegal conduct giving rise to the forfeiture and is therefore an "innocent owner" under 18 U.S.C. § 983(d)?

For the reasons stated below, the firearms are subject to forfeiture and Claimant has not

established by a preponderance of the evidence that he is an "innocent owner" under 18 U.S.C.

§ 983(d) entitled to have the weapons returned to him.

I.[1]

On June 14, 2007, agents from the Department of Justice Bureau of Alcohol, Tobacco,

Firearms and Explosives (ATF) seized the following five firearms[2] from the home of Martin

Wesley Taylor, a convicted felon:[3]

1.   One bolt-action Japanese rifle, serial no. 1270821, manufactured by Arisaka in Japan.

2.   One K98 German sniper rifle, serial no. 725L, manufactured in Germany, with original issue scope and apparently all original parts.

3.   One Nambu Japanese pistol, serial no. 24788, manufactured by the Japanese Imperial Arsenal in Japan.

4.   One model DWM-1917 Luger pistol, serial no. 8657, manufactured by Deutsche

---

[1]The facts recited here are derived from the record as a whole, including (i) depositions of Claimant and ATF Special Agent William Charles Metcalf, (ii) affidavits from ATF Special Agents Stephen Patrick and Darin Ramsey, (iii) a surveillance videotape of the June 11, 2007, meeting of Taylor, ATF Agent Metcalf, and an ATF confidential informant, and (iv) various documents submitted by the parties.

In the course of oral argument, the parties confirmed that the current record is complete, that they do not seek to introduce any additional evidence, and that they do not consider any material facts to be genuinely disputed.

[2]At least four of the five firearms have significant commercial value. According to Claimant's father, the Japanese rifle is worth $175, the German rifle, $14,000, the Nambu pistol, $2,800, and the Luger pistol, $14,000. Expert examination by the ATF confirmed each firearm's situs of manufacture as either Japan or Germany.

[3]In November 2005, Taylor was convicted in the Circuit Court of Loudoun County, Virginia, on counts of (1) obtaining money by false pretenses (a Class 4 Felony) and (2) giving a false report to a law enforcement official (a Class 1 Misdemeanor). Although Class 4 Felonies are punishable by two to 10 years of imprisonment, the jury voted to "fix his punishment" on the first count at a monetary fine and six months of incarceration, all of which was suspended. Va. Code § 18.2-10(d).

Waffen-und-Munitionsfabriken in Germany and purportedly once owned by
General Raeder of the Nazi German Navy.

5.      One .38 caliber handgun, serial no. 481, manufactured in Germany.

The ground for the seizure was an alleged § 922(g) violation:  Taylor was a convicted felon who
had knowingly and unlawfully possessed the firearms.

Taylor, born in 1943, had been a collector of World War II era weapons and
memorabilia since the age of 12.  In 1981, he obtained a Federal Firearms License authorizing
him to buy, collect, and sell firearms that are "curios or relics," i.e. firearms of special value to
collectors, either because the weapons are more than 50 years old or they have some other
historical significance.  Taylor's health had been declining in recent years; he was a double
amputee and used a wheelchair.  He died of natural causes on September 23, 2007,
approximately four months after the seizure, but before being charged or convicted of a § 922(g)
offense.

Claimant, Timothy Anthony Taylor, is Taylor's adult son.  He is 38 years old, lives in
Arlington, Virginia, and is employed in sales by Mohawk Industries, a textile company.
According to Claimant, Taylor gave him the five firearms on two occasions:  (1) October 2005
and (2) January or February 2006.  On the first occasion, in October 2005, Taylor gave Claimant
the Japanese rifle and another weapon not at issue here, physically handing him both firearms.
On the second occasion, in January or February 2006, Taylor gave Claimant the four other
weapons, the German rifle and the three handguns.  At that time, the handguns were stowed in a
briefcase on the floor, and because Taylor, in his disabled state, was unable to reach down and
pick up the briefcase, he pointed to it and instructed Claimant to place it on his desk.  On both
occasions, Taylor spoke to Claimant alone in Taylor's home office in Round Hill, Virginia.

Taylor explained to Claimant that the firearms were in the nature of an "early inheritance," and Claimant understood that he and his older brothers would each receive gifts from their father's collection amounting to the same value. Although Claimant had never been interested in Taylor's collection, he knew the firearms were valuable and he expected to sell them in the future. No one witnessed these gifts, as it was Taylor's custom to speak to his sons individually in his home office.

Claimant initially stored the rifles at his sister's house in Round Hill, Virginia, but subsequently moved all the firearms in issue to a storage unit at his Fairfax, Virginia, apartment. In February 2007, the storage unit flooded and Claimant returned the firearms to his father's house in Round Hill, placing them in his father's home office. Claimant was aware at the time that his father had been convicted of a felony and that it was illegal for him to possess firearms. Yet, according to Claimant, his father was then in declining health–heavily medicated, not eating, asleep 20 hours a day, and suffering from painful bedsores that kept him out of his wheelchair when he was awake. Thus, according to Claimant, "the furthest thing from my father's mind was that the guns were in his office." Nonetheless, Claimant admits that when he returned the firearms to his father's house, he awakened his father to inform him that he had stored the firearms in his father's office, but his father did not respond and Claimant further testifies, "I don't think he even heard me, to be honest with you."

The record reflects that the firearms in issue remained in Taylor's home office from February 2007, when Claimant left them there, until June 2007, when they were seized by ATF agents. Claimant admits that he did not know his ailing father's daily routine during this period, but states that it was his belief that his father slept the majority of the day, usually arising only to

venture into the kitchen.  Claimant further notes that he believed that his father would not

normally go into the home office where the firearms in issue were located.  Yet, the record

discloses neither the source or bases of Claimant's beliefs in this respect, nor does it reflect that

Claimant had any contact with his father during this February-June 2007 period.

      Although aware generally of his father's lifelong firearms collection activities, Claimant

did not know Taylor had applied to renew his Federal Firearms License on April 6, 2006, only a

few months after giving Claimant the second batch of firearms.  Claimant was also unaware that

Taylor had signed a statement for his probation officer on June 8, 2006, averring that he had

"disposed of all firearms as instructed by the Loudoun County Circuit Court," although

Claimant admits he knew his father was a convicted felon prohibited from possessing firearms.

Claimant further states that he did not give his father permission to sell the firearms for him, nor

did he and his father ever discuss plans to sell them.

      In January 2007, a federally licensed firearms dealer informed the Loudoun County

Sheriff's Office that an individual identified as Martin Wesley Taylor had called him twice,

circa January 4 and 5, to ascertain whether the dealer would be willing to purchase an

unregistered, fully automatic machine gun from Taylor.  This dealer was familiar with Taylor, as

he had dealt with him previously in connection with Taylor's efforts to procure World War II-

era firearms.  The Sheriff's Office relayed this information to the ATF, which then determined

that Taylor had not registered any such automatic weapons with the ATF, as required for

possession of an automatic weapon.  ATF agents also learned of Taylor's criminal record, and

discovered the April 6, 2006, application to renew his Federal Firearms License.  Where the

renewal form asked, "Have you ever been convicted in any court of a crime for which the judge

could have imprisoned you for more than one year, even if the judge actually gave you a shorter

sentence?" Taylor had falsely written, "no."

Based on this information, ATF agents decided to undertake an undercover investigation

to ascertain whether Taylor was violating any laws.  To this end, an ATF confidential informant

(CI) called Taylor in early June 2007 to arrange a meeting at Taylor's home for the purpose of

purchasing historical firearms.  The CI and Taylor set an appointment to meet at Taylor's home

on June 11, 2007, for this purpose.  On the appointed day, the CI, accompanied by ATF Special

Agent William Charles Metcalf posing as the CI's son, went to Taylor's home in Round Hill.

Agent Metcalf covertly made an audio and video recording of the meeting.  Agent Metcalf

testified that one of Taylor's sons, Ward, greeted them at the door, but left soon thereafter, and

that Taylor's wife may have been in a back room.  The video shows Taylor seated in his

wheelchair just to the right of the entryway, looking somewhat frail and gaunt.  The CI greeted

him and, apparently referring to their telephone conversation, expressed happiness that Taylor

was home from a recent stay in the hospital.  The video reflects that Taylor then directed Agent

Metcalf's and the CI's attention to a closet to the right of the entrance where some Nazi

uniforms and other paraphernalia were displayed.  Acknowledging this material, the CI made

clear to Taylor that he was more interested in guns.  Thereafter, Taylor led the CI and Agent

Metcalf through the house to Taylor's home office.  Although the video does not show Taylor

traveling through the house, the faint whir on the audio suggests that he did so in a motorized

wheelchair.  Once in Taylor's office, the video shows a large Nazi flag draped over some

furniture.  Opposite thereto stood an L-shaped desk.  Taylor maneuvered his wheelchair to a

position behind the desk.  Speaking in a weak but coherent voice, Taylor verbally directed the

CI's attention to the pair of rifles in issue here, which were standing in the corner to the right in plain view but wrapped in protective sleeves. The CI picked up the German sniper rifle first, slipped off its sleeve, and examined it for a few minutes while discussing with Taylor the weapon's history, technical specifications, and price. Next, the CI picked up and made a similar examination of the Japanese rifle, which Taylor initially misidentified as Chinese, but corrected himself after the CI called attention to the attached tag specifying the rifle's Japanese make. The CI then asked about pistols. Although Taylor initially said he did not have any, the video shows that Taylor then turned to his left and seemed to be pulling at something out of sight, under his desk. The undercover agent offered to help, and to this end, moved around to Taylor's side of the desk, reached forward, and lifted a briefcase onto the desk. Inside the briefcase were the three handguns in issue in this matter. The CI removed the handguns from the case and discussed them with Taylor, again touching on the firearms' history, specifications, and price.

On the basis of the meeting with Taylor, ATF agents obtained a federal search warrant, and on June 14, 2007, they executed the warrant on Taylor's Round Hill home and seized the five firearms in issue here.

## II.

The government typically seeks forfeiture of firearms based on a § 922(g) violation only after obtaining a conviction. Not so here. Taylor was never convicted of the underlying § 922(g) offense; he died before he could be charged, tried, and convicted. Analysis here must therefore begin by addressing whether forfeiture is warranted pursuant to 18 U.S.C. § 924(d)(1) even in the absence of a § 922(g) conviction.

Both statute and precedent compel an affirmative answer to this question. Section

924(d)(1) explicitly designates any "violation" of § 922(g)–rather than a conviction–as the triggering event for a civil forfeiture proceeding.  18 U.S.C. § 924(d)(1).  Thus, the statute requires only a violation, not a conviction.  In so doing, the statute is consistent with the long history of civil forfeitures *in rem*, where "the proceeding *in rem* stands independent of, and wholly unaffected by any criminal proceeding *in personam*."  *The Palmyra*, 25 U.S. (12 Wheat.) 1, 15 (1827).  Accordingly, property may be subject to forfeiture under statute "even if its owner is acquitted of–or never called to defend against–criminal charges."  *United States v. 7715 Betsy Bruce Lane*, 906 F.2d 110, 112 (4th Cir. 1990) (quoting *United States v. 3120 Banneker Dr., N.E.*, 691 F. Supp. 497, 499 (D.D.C. 1988)).  *See also United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 362 (1984) (holding that defendant's acquittal on criminal charges "does not estop the government from proving in a civil proceeding that the firearms should be forfeited pursuant to § 924(d)," due to the "difference in the relative burdens of proof in the criminal and civil actions").  Thus, the absence of a conviction of Taylor for a § 922(g) violation is no impediment to the forfeiture of the firearms.

But this does not end the forfeiture analysis.  The government must also establish "by a preponderance of the evidence, that the property is subject to forfeiture."  18 U.S.C. § 983(c)(1). In other words, the government must prove the existence of the § 922(g) violation that serves as the predicate for forfeiture.  Under 18 U.S.C. § 924(d)(1), the government may seize and forfeit "[a]ny firearm or ammunition involved in or used in any knowing violation" of several enumerated firearms offenses, including § 922(g), which makes it unlawful for any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to "possess in or affecting commerce, any firearm or ammunition."  18 U.S.C. §§

-8-

922(g), 924(d)(1).  To prove a violation of § 922(g),  the government must meet its burden in

establishing three elements:

1.     That Taylor previously had been convicted of a crime punishable by a term of
       imprisonment exceeding one year;

2.     That Taylor knowingly possessed, transported, shipped, or received the firearm;
       and

3.     That Taylor's possession of the firearms was in or affecting commerce, because
       they had traveled in interstate or foreign commerce at some point during their
       existence.

*United States v. Langley*, 62 F.3d 602, 606 (4th Cir. 1995) (en banc).  Because the record

evidence establishes each of these elements by substantially more than a preponderance of the

evidence, it follows that forfeiture is warranted under § 924(d).[4]

### 1. Taylor's previous felony conviction

To establish the first element, the Government need only show that the Taylor was

convicted of a crime and that the crime is punishable by a term of imprisonment exceeding one

year.  *Langley*, 62 F.3d at 606.  Two aspects of this element merit closer attention.  First, the

sentence an individual actually receives is not determinative of this element; rather, it is only the

statutorily-possible sentence that counts for this purpose, as it is settled that "[s]ection 922(g)(1)

requires only that the *crime* be punishable by a term exceeding one year."  *United States v.*

*Jones*, 195 F.3d 205, 207 (4th Cir. 1999).  Clearly, "Congress could have written § 922(g)(1)

---

[4]Claimant's argument that the search warrant executed on June 14, 2007, was invalid for
lack of probable cause is frivolous, both because the undercover investigation and video
surveillance footage provided ample probable cause, and because Claimant lacks standing to
contest the fruits of the search.  *Rakas v. Illinois*, 439 U.S. 128, 134 (1978) (holding that an
individual cannot challenge "a search of a third person's premises or property" as he "has not had
any of his Fourth Amendment rights infringed").

differently had it intended to focus on the individual in particular rather than the crime for which the individual was convicted." *Id.* (quoting with approval the findings of the district court). Second, the government need not prove that the defendant knew of his status as a felon prohibited from possessing firearms.  In *Langley*, the Fourth Circuit held that while the text of § 922(g) itself includes no explicit mens rea requirement, the default penalty provision, 18 U.S.C. § 924, applies a mens rea of knowledge to the underlying violation by prescribing punishments for "knowing violation[s]" of § 922(g).[5]  62 F.3d at 604.  Importantly, however, *Langley* did not extend the knowledge requirement to all three elements of the offense; to the contrary, the Fourth Circuit explicitly rejected "the notion that the government is required to prove either knowledge of felony status or interstate nexus in a § 922(g)(1) prosecution," choosing instead to limit the mens rea to the act of possessing the firearms.  *Id.* at 606.

Here, the undisputed facts reflect that Taylor was a convicted felon prohibited under 18 U.S.C. § 922(g) from possessing firearms.  Claimant acknowledges that Taylor was convicted of a Class 4 felony, punishable under Va. Code § 18.2-10(d) by up to 10 years of imprisonment. Seeking to avoid the conclusion that this meets the threshold under *Langley*, however, Claimant cites *Bryan v. United States* to argue that Taylor must have knowledge of the factual basis for his prohibited status.  524 U.S. 184 (1998).  Claimant misunderstands the significance of *Bryan*. It held only that where a statute calls for a mens rea of knowledge, "the term 'knowingly' . . . requires proof of knowledge of the facts that constitute the offense."  *Id.* at 193.  But here, the

---

[5]Although *Langley* dealt with criminal prosecution rather than civil forfeiture arising from a § 922(g) violation, the mens rea required under § 924 is identical for both types of proceedings: § 924(a)(2) imposes criminal sanctions for anyone who "knowingly violates" § 922(g), and § 924(d)(1) provides for forfeiture of firearms involved in any "knowing violation" of § 922(g).

relevant statutes simply do not require any showing of mens rea with respect to Taylor's felony conviction or the sentence prescribed by statute. *Langley*, 62 F.3d at 606.  There is, therefore, no merit to Claimant's argument that Taylor, although aware of his conviction, mistakenly believed his sentence was insufficient to trigger firearms disabilities under § 922(g).  In the words of the Fourth Circuit, establishing felony status within the meaning of § 922(g) "does not require proof of knowledge on the part of the defendant as to the maximum penalty which might have been imposed . . . . Congress did not make ignorance of the law a defense in a prosecution under § 922(h)." *United States v. Williams*, 588 F.2d 92, 92-93 (4th Cir. 1978).[6]

### 2. Taylor's knowing possession of the firearms

To establish the possession element, the government must show that the defendant "knowingly possessed" the firearm. *Langley*, 62 F.3d at 606.  Here, *Bryan* is properly invoked to require the government to adduce "proof of knowledge of the facts that constitute the offense"–i.e. it must show the defendant knew the firearm was in his possession.  524 U.S. at 193; *United States v. Gilbert*, 430 F.3d 215, 219 (4th Cir. 2005).

The government need not prove "actual or exclusive possession" to establish a § 922(g) violation; rather, "constructive or joint possession is sufficient." *United States v. Gallimore*, 247 F.3d 134, 136-37 (4th Cir. 2001).  Actual possession requires showing that "the defendant voluntarily and intentionally had physical possession of the firearm," while constructive possession requires only that "the defendant intentionally exercised dominion and control over the firearm, or had the power and the intention to exercise dominion and control over the

---

[6]The statute addressed in *Williams*, § 922(h), prohibits anyone defined as a felon under § 922(g) from receiving, possessing, or transporting firearms in interstate commerce.  18 U.S.C. § 922(h); *Williams*, 588 F.2d at 92.

firearm." *United States v. Scott*, 424 F.3d 431, 435-36 (4th Cir. 2005).

Constructive possession may be inferred from direct or circumstantial evidence of the defendant's "dominion and control" over the firearm. *United States v. Shorter*, 328 F.3d 167, 172 (4th Cir. 2003) (citing *United States v. Jackson*, 124 F.3d 607, 610 (4th Cir. 1997)). It follows, as courts have recognized, that merely finding a firearm in a defendant's home may be sufficient to "permit[] an inference of constructive possession." *Id. See also United States v. Mabry*, 3 F.3d 244, 247 (8th Cir. 1993) ("In the absence of evidence refuting the normal inference of dominion, showing that a firearm was discovered at the defendant's residence suffices to prove constructive possession."). Constructive possession in these cases combines elements of regular proximity and awareness of the firearms, such as where the defendant's "apartment was not so large, and the weapons were not so well hidden, as to prohibit a reasonable fact finder from concluding that [the defendant] was aware of their presence," or where the defendant "was a regular occupant" of the house where firearms were found "and the firearms were in places where he would have seen them." *Shorter*, 328 F.3d at 172; *Gallimore*, 247 F.3d at 137 n.1. It is also true that constructive possession may be inferred from a defendant's behavior if it demonstrates dominion and control over an item outside of his physical presence, as for example, where a defendant instructed a drug courier via telephone to cancel the planned sale of a shipment of cocaine and to place the drugs in the defendant's boat. *United States v. Livas*, 867 F.2d 609, 1989 WL 5578, at *3 (4th Cir. Jan. 25, 1989) (unpublished opinion).

Here, there is ample evidence of Taylor's exercise of dominion and control over the firearms. Moving unassisted through his own home, Taylor led the CI and undercover ATF

agent into his office where the firearms were stored in plain view, verbally directed his visitors to the rifles and invited them to make a closer examination, physically attempted to retrieve the handguns from where they had been stored, out of sight, beneath his desk, and lucidly discussed the history, technical specifications, and prices of the firearms with the CI and ATF agent. There can be no doubt that this evidence establishes the knowing possession required to prove a § 922(g) offense.

### 3. Firearms' nexus with interstate commerce

Finally, the government must establish the third element, namely that "the possession was in or affecting commerce." *Langley*, 62 F.3d at 606.  Under *Langley*, the Government need not prove the defendant had any knowledge of the interstate nexus.  62 F.3d at 606.  In order to meet its burden, the Government must demonstrate only "that a firearm was manufactured outside the state where the defendant possessed it." *Gallimore*, 247 F.3d at 138.

Here, it is undisputed that all five firearms in issue were manufactured in Japan or Germany, which suffices to establish the requisite interstate commerce nexus.  There is no requirement that the government show Taylor had any knowledge of the interstate commerce nexus, but even if there were, the record demonstrates Taylor was well-aware that the firearms were all manufactured outside of Virginia.  Indeed, Taylor seems to have derived much of the enjoyment and profit of his hobby from the exotic provenance of his weapon collection.

Claimant argues that under the Supreme Court's holding in *United States v. Lopez*, the government must "ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce" to meet constitutional muster.  514 U.S. 549, 561 (1995). Claimant misreads *Lopez*, placing more weight on this decision than it can properly bear.  It is

-13-

well-settled that § 922(g) merely requires the government to prove the firearms were possessed "in or affecting commerce" by showing they were manufactured out-of-state, and that "[t]he existence of this jurisdictional element, requiring the Government to show that a nexus exists between the firearm and interstate commerce to obtain a conviction under § 922(g), distinguishes *Lopez* and satisfies the minimal nexus required for the Commerce Clause." *United States v. Wells*, 98 F.3d 808, 811 (4th Cir. 1996); *see also United States v. Crump*, 120 F.3d 462, 465 (4th Cir. 1997); *Gallimore*, 247 F.3d at 138.

III.

Given that forfeiture of the firearms is warranted on the basis of Taylor's § 922(g) violation, the analysis next proceeds to the question of whether Claimant is an innocent owner of the firearms. Even where, as here, the government has established that the firearms were involved in a violation of 18 U.S.C. § 922(g) and thereby subject to forfeiture, Claimant may still prevent forfeiture by establishing that he is an innocent owner and thus entitled to return of the firearms. 18 U.S.C. § 983(d)(1). To do so, Claimant must satisfy the burden of proving "by a preponderance of the evidence" either (1) that he "did not know of the conduct giving rise to forfeiture," or (2) that "upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." 18 U.S.C. § 983(d)(1)-(2)(A). Here, Claimant relies only on the first of these; he claims he did not know of his father's illegal conduct. More specifically, Claimant concedes he knew his father was a convicted felon prohibited from possessing firearms, and that he was aware the firearms were manufactured overseas, but he claims he did not know his father had possession of the firearms. Such a claim hinges on the "subjective knowledge of the owner," and since

-14-

Claimant bears the burden of proof, "it is the claimant's responsibility to prove the *absence* of actual knowledge." *United States v. $10,694.00 U.S. Currency*, 828 F.2d 233, 234-35 (4th Cir. 1987) (quoting *United States v. $4,255,000*, 762 F.2d 895, 907 (11th Cir. 1985)).  If a claimant fails to carry this evidentiary burden, then "summary judgment is properly granted to the government based on its showing of probable cause" for the forfeiture. *7715 Betsy Bruce Lane*, 906 F.2d at 111 (citing *United States v. 4492 S. Livonia Rd.*, 889 F.2d 1258, 1267 (2d Cir. 1989)).  Nor, as the Fourth Circuit has sensibly recognized, can any claimant meet the required evidentiary burden merely on the basis of general denials of knowledge.[7]  A contrary rule would effectively end the efficacy of Rule 56 in these cases.

The question presented here is whether the record reflects that Claimant has met his burden of proving lack of knowledge of his father's possession of the firearms.  Because possession may be actual or constructive, Claimant must prove he was unaware not only of any "physical possession" by Taylor, but also unaware that Taylor knew the firearms were in his home office and thus had any "power and . . . intention to exercise dominion and control over the firearm[s]" on Taylor's part. *Scott*, 424 F.3d at 435-36.  Claimant must therefore offer evidence to disprove the normal conclusion that "the fact that the firearms . . . were found" in Taylor's  house "permits an inference of constructive possession" derived from the logical

---

[7]*See, e.g., United States v. Scrapp Inv. Co.*, 39 F.3d 1179, 1994 WL 592735, at * 4 (4th Cir. Oct. 31, 1994) (unpublished opinion) (affirming summary judgment denying innocent owner claim where "the only evidence [claimant] presented in support of its innocent owner defense was general denials contained in its answers to the government's interrogatories"); *United States v. Cook*, 64 F.3d 660, 1995 WL 508888, at * 2 (4th Cir. Aug. 29, 1995) (unpublished opinion) (affirming summary judgment denying innocent owner claim where claimant's sworn answers to the government's interrogatories "made only general denials of knowledge regarding the drug activity that occurred on her property").

implication that Taylor "was aware of their presence." *Shorter*, 328 F.3d 167 at 172.

These settled principles applied here compel the conclusion that Claimant has not adduced evidence adequate to meet the requisite burden of proof.  Distilled to its essence, Claimant grounds his lack of knowledge claim on his *belief* that his father did not hear him when he told his father that he had placed the firearms in the home office, and on his *belief* that his father did not know the firearms were there.  His lack of knowledge claim is also grounded in his *belief* that his father was unlikely to venture into the home office.  These beliefs amount to no more than a general denial of knowledge and hence fall short of satisfying Claimant's burden of proving he had no knowledge that his father was in possession of the firearms.  Notably, Claimant made no attempt to conceal the presence of the firearms from his father;  he placed the weapons in his father's home office in his Round Hill house, left them in plain view, and went so far as to awaken his father to tell him where the firearms could be found.  The mere fact that Taylor did not say anything in response on that day in February 2007 is an inadequate foundation for Claimant's belief that his father then remained ignorant of the firearms' presence at all times thereafter, especially given that, so far as this record reflects,[8] Claimant was not even in contact with his father during the period from February 2007, when he left the firearms in his father's home office, until June 2007, when the firearms were seized.  Claimant's narrowly-worded denial that there was no conversation between Claimant and his father about the possibility of selling the firearms does nothing to illuminate whether his father was unaware of the firearms' presence in his father's home office.

Claimant's record evidence is therefore inadequate to satisfy his burden of proving "the

---

[8] *See supra* n.1.

*absence* of actual knowledge" of his father's constructive possession of the firearms.

*$10,694.00 U.S. Currency*, 828 F.2d at 235.[9]  Claimant's innocent owner claim accordingly

fails.

      An appropriate order will issue.

/s/
_____

Alexandria, VA                          T. S. Ellis, III
August 14, 2008                   United States District Judge

---

[9]While there is some authority that a claimant may present evidence of his lack of knowledge sufficient to raise an issue of triable fact, those cases involve different facts and circumstances not at issue here and accordingly are not apposite.  *See, e.g.*, *United States v. 717 S. Woodward St.*, 2 F.3d 529, 534 (3d Cir. 1993) (claimant's sworn testimony that he was unaware of third party's drug possession was sufficient to defeat summary judgment where government introduced no evidence that would allow a reasonable jury to disbelieve claimant's testimony); *United States v. 2511 E. Fairmount Ave.*, 722 F. Supp. 1273, 1282 (D. Md. 1989) (questions regarding credibility of claimant's denials created triable issue of fact precluding summary judgment).  Here, by contrast, Claimant concedes he knew two of the three elements comprising the predicate offense, but offers only what amounts to a general denial as to the third element.  Thus, this case is more closely apposite to *Scrapp* and *Cook*, where the Fourth Circuit affirmed a grant of summary judgment on the basis of a claimant's failure to adduce evidence sufficient to meet his burden of proof.  *See Scrapp Inv. Co.*, 1994 WL 592735, at * 4; *Cook*, 1995 WL 508888, at * 2.